In the

# United States Court of Appeals

## For the Seventh Circuit

No. 08-2461

CONSTRUCTION AND DESIGN CO., *et al.*,

*Petitioners-Appellants*,

*v.*

UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES,

*Respondent-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1322—**Robert M. Dow, Jr.**, *Judge*.

ARGUED JANUARY 21, 2009—DECIDED APRIL 21, 2009

Before POSNER, FLAUM, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The Immigration and Nationality Act allows an alien, upon the petition of an employer, to obtain a visa if the Department of Labor certifies that no U.S. citizen is qualified for the work, 8 U.S.C. § 1153(b)(3)(A)(i), and if in addition the employer satisfies the Department of Homeland Security that he can afford to pay the alien's wage. 8 C.F.R. § 204.5(g)(2). The addi-

tional requirement is intended to prevent the form of immigration fraud in which an employer sponsors an alien but does not intend to employ him. For that implies that despite the Labor Department's certification there actually is no need for him in the U.S. economy, and, moreover, that for this reason he may well end up unemployed. See Department of Justice, United States Attorney's Office for the Southern District of Iowa, "Media Release: 11 Arrested, Indicted in Multi-State Operation Targeting Visa and Mail Fraud," Feb. 12, 2009, www.oig.dol.gov/public/media/20090212visionsystemsindicment.pdf (visited Mar. 18, 2009).

The employer in this case, the Construction and Design Company, is a small construction company organized as a Subchapter S corporation. Such a corporation can choose to have its corporate income pass through the corporation without being subject to corporate income tax; instead that income is taxed as individual income to the shareholders. *Gitlitz v. Commissioner*, 531 U.S. 206, 209-10 (2001). The purpose of Subchapter S is "to eliminate tax disadvantages that might dissuade small businesses from adopting the corporate form and to lessen the tax burden on such businesses." *Bufferd v. Commissioner*, 506 U.S. 523, 524-25 (1993).

Construction and Design consists of an owner and three employees. Its gross receipts in the year in question were almost $400,000 but its net income and net assets, according to its tax return and its balance sheet, were close to zero. The owner received officer compensation of about $40,000 a year. The Department of Homeland Security

ruled that the employer could not afford to pay the alien in question, a Ukrainian carpenter, the $50,000-plus salary that the employer said it wanted to pay him. The employer and the alien sought judicial review in the district court of the denial of the work visa, lost, and appeal. (A complication, which we discuss at the end of the opinion, is the presence of a third plaintiff-appellant—an alien sought to be employed by a company that is not a party to this suit.)

We were thrown by the government's brief. It argues that when as in this case the employer's net taxable income and net assets are smaller than the alien's projected salary, the employer must show either that the salary is replacing a higher salary (or other cost) or that the employer usually makes an adequate profit but has encountered a "rough patch," as in *In re Sonegawa*, 12 I & N 612 (Regional Comm. 1967). That is not the position of the Department of Homeland Security, makes no sense, and was renounced by the government's lawyer in a post-argument submission after he had taken some heavy blows at the oral argument.

The distinction that the government's brief missed is between accounting entities and cash flow. Accounting entities such as depreciation and other reserves are intended to provide information valuable to investors and creditors (and the audited enterprise itself) and to minimize tax liability. E.g., *Resser v. Commissioner*, 74 F.3d 1528, 1538 (7th Cir. 1996). They are not intended to tell a firm whether to hire another employee or incur some other operating expense. If the firm has enough cash flow, either

existing or anticipated, to be able to pay the salary of a new employee along with its other expenses, it can "afford" that salary unless there is some reason, which might or might not be revealed by its balance sheet or other accounting records, why it would be an improvident expenditure. See generally Jae K. Shim & Joel G. Siegel, *Handbook of Financial Analysis, Forecasting, and Modeling* 84-85 (3d ed. 2007).

The distinction between accounting profits, losses, assets, and liabilities, on the one hand and cash flow on the other is especially important when one is dealing with either a firm undergoing reorganization in bankruptcy or a small privately held firm; in the latter case, in order to avoid double taxation (corporate income tax plus personal income tax on dividends), the company might try to make its profits disappear into officers' salaries. See *Menard, Inc. v. Commissioner*, No. 08-2125, 2009 WL 595587, at *1 (7th Cir. Mar. 10, 2009). The owners of a Subchapter S corporation, however, have the opposite incentive—to alchemize salary into earnings. A corporation has to pay employment taxes, such as state unemployment insurance tax and social security tax, on the salaries it pays. A Subchapter S corporation can avoid paying them by recharacterizing salary as a distribution of corporate income. To limit the ability of shareholder-employees to minimize their salaries and thus the company's employment taxes, the government requires that they be paid "reasonable salaries." Michael Schlesinger, *Practical Guide to S Corporations* ¶ 102.9, pp. 5-6; ¶ 1302.10, p. 461 (4th ed. 2007).

Because tax considerations drive a wedge between accounting income and economic income, a company's tax returns are not a reliable basis for determining whether the company can afford to hire another employee. A profitable company might have no taxable income because it was able to transmute income into salaries (the closely held corporation that is *not* organized under Subchapter S), or more taxable than real income because it was able to transmute salaries into income (the Subchapter S corporation). The Department of Homeland Security realizes this, and while to save time it looks at a firm's income tax returns and balance sheet first, it doesn't stop there unless those documents make clear that the salary of the alien whom the firm proposes to hire would not imperil the company's solvency. If that isn't clear, the firm has to prove by other evidence its ability to pay the alien's salary. *O'Conner v. Attorney General of the United States*, 1987 WL 18243, at *1 (D. Mass, Sept. 29, 1987); *Elatos Restaurant Corp. v. Sava*, 632 F. Supp. 1049, 1054 (S.D.N.Y. 1986); *In re X*, 15 Immigration Rptr. B2-22 (Admin. Appeals Unit Aug. 16, 1995); *In re X*, 13 Immigration Rptr. B2-166 (Admin. Appeals Unit Sept. 23, 1994); *In re Sonegawa*, *supra*, 12 I & N Dec. at 615. The employer in our case concedes as it must that it bears the burden of proof. 8 U.S.C. § 1361; *River Street Donuts, LLC v. Chertoff*, 2007 WL 2259105, at *3 (D. Mass. Aug. 3, 2007); *Sitar Restaurant v. Ashcroft*, 2003 WL 22203713, at *3 (D. Mass. Sept. 18, 2003); *Elatos Restaurant Corp. v. Sava*, *supra*, 632 F. Supp. at 1054.

The alien whom Construction and Design wanted to hire had been working as an independent contractor for the

company. In that capacity he had been paid $23,000 less than the salary the company says it wants to pay him as an employee. It is not unusual for a firm to hire a person first as an independent contractor in order to avoid having to pay any benefits and then, if he works out, to convert him to an employee. Fred S. Steingold, *Legal Guide for Starting and Running a Small Business* 302 (10th ed. 2008); Steven D. Strauss, *The Small Business Bible* 249-50 (2004). But to pay him as an employee almost twice as much as it paid him as an independent contractor—which understates the difference in cost to the employer, because of employment taxes—makes one wonder whether Construction and Design was concerned that the meagerness of the compensation it was paying would undermine its claim that no American was qualified to do the work that the alien was doing for the company.

Maybe, however, he was going to be working longer hours as an employee. Even so, it is unclear where the extra money he was going to be paid, plus employment taxes (plus employee benefits, if any), would be coming from. The company's balance sheet does not include noncash liabilities such as depreciation or loss carryforwards that would cause the company's cash position—its resources for expansion—to be understated. There is also no evidence that the firm had landed a new contract requiring more staff (or that the alien work longer hours) the cost of which the company would finance by borrowing, or by raising capital in some other way. The only "air" in the company's income statement is the owner's $40,000 salary, and there is no suggestion that he planned to cut his salary in half in order to be

able to pay the higher cost of the alien as an employee. And despite our earlier point that the owner of a Subchapter S corporation has an incentive to recharacterize his salary as income, this company reports essentially no income, whether income taxable as corporate income or passed through to the shareholders to be taxed as personal income to them.

True, the Department of Homeland Security must not take too static a view of a business firm's decision to purchase an additional input, whether of capital or labor. "The balance sheet is only a snapshot of the employer's assets at a given moment and, thus, speaks only obliquely to the employer's ability to generate cash for payment of wages at some later date . . . . [O]ne would expect an employer to hire only workers whose marginal contribution to the value of the company's production equals or exceeds their wages." *Masonry Masters, Inc. v. Thornburgh*, 875 F.2d 898, 903 (D.C. Cir. 1989). A new employee might boost the firm's income by more than his salary, and if so the firm should be able to borrow the money it needs in order to be able to pay that salary in advance of receiving the income that the new employee will generate for the firm; the firm might have a flood of orders and realistically anticipate that the revenue from filling them would exceed the salary of the additional workers that it would have to hire to be able to fill them. See *In re Sonegawa, supra*, 12 I & N Dec. at 615. That would actually be better evidence of a bona fide hiring decision than that the net income or net assets shown on its books exceeded the additional salary; a rational firm does not hire a worker who will not contribute to its bottom line, even if it has

enough money on hand to be able to do so. And remember that the firm in this case is not seeking to hire an extra worker but merely to change an existing worker's status from that of an independent contractor to that of an employee. Maybe without that change in status he would go elsewhere and leave the firm short-handed, but there is no evidence of that, just as there is no evidence that he would work more hours for this employer as an employee than as an independent contractor.

We turn now to the complication created by the presence of another alien as a party to this litigation, minus his prospective employer. R.G. Construction, a company in the same business as Construction and Design but unaffiliated with it, had filed a similar petition for a work visa, on behalf of a custom woodworker named Ozlanski, but had dropped out of the proceedings after the Administrative Appeals Unit in the immigration division of the Department of Homeland Security upheld the denial of the petition. R.G. was neither a plaintiff in the district court case nor an appellant in our court. Ozlanski, however, was a plaintiff and is an appellant.

One might doubt that Ozlanski has standing to sue in federal court, since not he but R.G. applied for the work visa and R.G. has not sought judicial review of the denial of the application. However, Ozlanski submitted an affidavit in the district court from the owner of R.G. in which the owner states that he formed a successor corporation to R.G. called JJL Restoration, which performs the same work and occupies the same place of business as R.G. did and intends to employ Ozlanski "as a custom

woodworker upon his receipt of employment authorization."

Section 10 of the Administrative Procedure Act, 5 U.S.C. § 702, entitles any person "suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute," to seek judicial review of the agency's action. The affidavit of R.G.'s owner suggests that Ozlanski is aggrieved by the denial of R.G.'s petition for a work visa for him and therefore has standing to seek judicial review. *Ghaly v. INS*, 48 F.3d 1426, 1434 n. 6 (7th Cir. 1995); *Stenographic Machines, Inc. v. Regional Administrator for Employment & Training*, 577 F.2d 521, 527-28 (7th Cir. 1978); *Taneja v. Smith*, 795 F.2d 355, 358 n. 7 (4th Cir. 1986). R.G. no longer exists but in *Taneja* the petitioner had informed the court that it was withdrawing the visa petition—it no longer wanted to employ the alien—yet the court held that this did not deprive the alien of standing, though it went on to hold that the employer's "changed intentions" entitled the government to deny the alien a visa. *Id*. at 358. In this case, too, there has been a change in the alien's employment prospects. Even if the government should have granted R.G.'s petition, it does not follow that it must grant JJL's, for there is no information that its economic circumstances are identical to its predecessor's. In any event, from the scanty information about R.G. that can be scavenged from the record, its financial situation appears to have been identical to that of Construction and Design: nominal profits, nominal assets, and a proposed $50,000-plus salary for Ozlanski if he becomes an employee. So even if R.G. had sought judicial review, the outcome would be the same.

The district court's affirmance of the denial of the two petitions for work visas is

AFFIRMED.