IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Income Tax

LEI (LYNN) WANG,                          )
                                          )
            Plaintiff,                    )     TC-MD 150422C
                                          )
      v.                                  )
                                          )
DEPARTMENT OF REVENUE,                    )
State of Oregon,                          )
                                          )
            Defendant.                    )     **FINAL DECISION**[1]

Plaintiff appeals Defendant's Notices of Deficiency Assessment dated February 18, 2015, for the 2010 and 2011 tax years. A trial was held in the Oregon Tax Courtroom on February 17, 2016, in Salem, Oregon. Hertsel Shadian, Attorney at Law, appeared on behalf of Plaintiff. Plaintiff and Krystal Davis (Davis), CPA, testified on behalf of Plaintiff. Nancy Berwick (Berwick) and Ira Mitchell, Tax Auditors, appeared on behalf of Defendant. Berwick testified on behalf of Defendant. Plaintiff's Exhibits 1 through 5 and Defendant's Exhibits A through G were received without objection.

## I. STATEMENT OF FACTS

Plaintiff testified that her business involves providing consulting services to U.S. companies seeking to register trademarks and other intellectual property in China. The companies need an agent who can file for protection in China. Plaintiff testified that U.S. companies could contact Chinese agents directly, but it is typically too complicated. Plaintiff has been licensed in China since 1994 and has the requisite knowledge, experience, and contacts to provide a valuable service to U.S. companies. She serves as a liaison between U.S. companies

---

[1] This Final Decision incorporates without change the court's Decision, entered June 8, 2016. The court did not receive a statement of costs and disbursements within 14 days after its Decision was entered. *See* Tax Court Rule–Magistrate Division (TCR–MD) 16 C(1).

and a Chinese agent that can file for intellectual property protection in China. Plaintiff's business requires developing relationships with clients and building trust with clients. When she takes on a case, she agrees to achieve a particular result for her client. Plaintiff receives an "instruction letter" from the client that is effectively a contract. A case may take 3 to 5 years to resolve.

Plaintiff testified that she has registered three corporations in Oregon through which she has conducted her business: First, in 2003, she registered Ansen. Plaintiff had a partner in China – also named Ansen – with whom she worked to provide her services to U.S. clients. Plaintiff built her client list "from scratch"; her first clients were in Oregon, but she expanded to Washington and British Columbia, Canada. After Plaintiff's first few years operating through Ansen, her Chinese partner at that time did not want to continue to grow the business. As a result, Plaintiff closed her business Ansen and, in January 2005, started a new S corporation, AFD, with a new Chinese partner, AFD-China. Plaintiff was the sole shareholder and sole officer of AFD. When she formed AFD, Plaintiff notified her Ansen clients and many chose to continue with Plaintiff and to do business with AFD.

Plaintiff testified that, near the end of 2007, she learned from her CPA that someone had registered a company name AFD in Maryland. The Maryland company emailed Plaintiff and asked for her EIN. Plaintiff discovered that the Maryland company was formed by a relative of her Chinese partner, AFD-China. She also learned that AFD-China had directly contacted one of her clients and told the client that Plaintiff was "fired." Plaintiff discovered that AFD-China had sent notices to over 200 of Plaintiff's clients directing them to pay Plaintiff's invoices to AFD-China rather than to AFD. She testified that she had between $250,000 and $500,000 in pending invoices at the time. Plaintiff began litigation against AFD-China in China. AFD-China sued

Plaintiff in the U.S. over the collection of invoices; the suit was first filed in California, then transferred to Oregon. As of the date of trial, AFD was still registered and had pending invoices that were the subject of litigation.

Plaintiff testified that, based on the advice of legal counsel and business contacts in China, she determined she needed an entirely new legal entity and a new bank account to continue her business. In February 2008, Plaintiff formed her third corporation, LW Peksung USA (Peksung), an S corporation. She established a new Chinese partner – also named Peksung – and continued to perform the same services as she had for Ansen and AFD. Plaintiff notified her clients from AFD and some chose to do business with Peksung. Plaintiff testified that, in 2008, 2009, and during the tax years at issue, Peksung was performing services for clients that originated with AFD. Over the years, Peksung began to develop its own clients. AFD has never sold its client list to Peksung or assigned its contract rights to Peksung.

A. *Payments by Peksung on Behalf of AFD in 2010 and 2011*

Peksung issued Forms 1099-MISC for the 2010 and 2011 tax years reporting payments of $244,163 and $212,169, respectively, to AFD. (Def's Ex B at 1.) AFD reported both amounts as gross income on its S corporation returns. (*See* Ptf's Ex 4 at 5-6, 9-10.) Peksung deducted the amounts as consulting fee expenses on its S corporation returns. (*See* Def's Ex C at 14, 17, 25, 28.) Plaintiff testified that Peksung and AFD had a contract for consulting services. (Ptf's Ex 5.) It was originally written in Chinese and eventually translated to English. (*Id.*) The contract was dated December 2010, but Plaintiff testified that it was meant to clarify and memorialize an existing oral agreement between the parties regarding consulting services. (*See id.*) The contract did not specify a fee. (*See id.*) Plaintiff testified that AFD sent invoices to Peksung and the invoices were for Plaintiff's time and knowledge. (*See* Ptf's Exs 2, 3.) The invoices billed

Peksung $20,000 per month for consulting fees. (*Id.*) Davis testified that she and Plaintiff discussed an appropriate fee for Plaintiff's time and determined that $20,000 per month was appropriate. She testified that the $20,000 fee represented more than the value of Plaintiff's labor.

Davis testified that AFD's gross revenue was approximately $1.3 million in 2007 and approximately $309,000 in 2008, collected on work done in prior years. She testified that AFD had no income in 2009, but Plaintiff was still completing work for AFD through Peksung. Plaintiff testified that most if not all clients with pending cases with AFD transferred those cases to Peksung. She testified that Peksung worked on cases initiated by AFD and that was the reason for the consulting fees. Plaintiff testified that, over time, Peksung developed some of its own clients. Davis testified that when Peksung started, probably all of its receipts were from AFD client work; over time, the balance of receipts from AFD client contracts as compared with receipts from new clients shifted. She testified that, as of 2009, Plaintiff was doing work on contracts originated with AFD, but did the work for Peksung and invoiced it to Peksung. Davis testified that, for its payments to AFD, Peksung received the right to continue to service AFD's existing client contracts – and collect payment – and also to generate new business with AFD's existing clients. She testified that AFD did not assign its contracts to Peksung.

Plaintiff testified that she needed to maintain AFD's bank account due to the ongoing litigation, but was concerned about the potential for seizure of AFD's bank account assets. She testified that her attorney suggested that Peksung pay AFD's legal fees. Plaintiff testified that Peksung's payment of AFD's legal fees was reported by AFD as gross income and offset AFD's legal expenses. Davis testified that AFD's income in 2010 and 2011 was comprised entirely of the consulting fees paid by Peksung. Plaintiff maintained an account sheet in 2010 and 2011

detailing the invoices sent by AFD and the payments made by Peksung. (Ptf's Ex 1.) Davis testified that Peksung paid AFD's legal fees as they came due; they were sometimes more and sometimes less than the invoices, but it all balanced out at the end. (*See id.*) The account sheet does not reflect any payments of $20,000. (*See id.*)

The invoices from AFD each include the statement: "If a bill for our fees or expenses is not paid within thirty (30) days from the date of the debit note, a late charge of two percent (2%) per month is imposed, commencing from the date of the debit note and continuing until it is paid in full." (Ptf's Exs 2, 3.) There is no indication on the account sheet that a late fee was ever imposed or paid, despite that fact that invoiced amounts remained unpaid for more than 30 days from the invoice date on numerous occasions. (*See* Ptf's Ex 1.)

B.    *Defendant's Audits of AFD and Peksung*

Defendant audited the 2010 and 2011 returns of both AFD and Peksung. (*See* Ptf's Ex 4; Def's Ex C.) Davis testified that Defendant began its audit with AFD. She testified that Defendant opened an audit on Peksung for the same tax years after the AFD audit was closed. Davis testified that she sent Defendant the Form 1099s reporting income to AFD from Peksung.

For the 2010 tax year, Defendant allowed $215,725 of the $244,163 in legal fee expenses claimed by AFD. (Ptf's Ex 4 at 6.) For the 2011 tax year, Defendant allowed $209,648 of the $211,365 in legal fee expenses claimed by AFD. (*Id.* at 10.) For each tax year, Defendant wrote the allowed amount of "legal expense was both verified as [an] expense of the corporation and shown to have been paid in [the tax year it was claimed]." (*Id.* at 3, 7.) Defendant did not adjust the income that AFD received from Peksung during its audit of AFD. (*See id.*) Berwick stated that Defendant did not audit AFDs income, only its expenses. (*See also* Def's Ex C at 1.)

/ / /

In its audit of Peksung's 2010 and 2011 returns, Defendant disallowed the consulting expenses paid to AFD. (Def's Ex C at 14, 25.) In the audit reports, Defendant wrote "[d]ecrease consulting fees for legal expense paid for a separate entity. This is not Peksung's expense to deduct." (*Id.*) Defendant also increased officer compensation from $5,000 to $106,580 for the 2010 tax year and from $30,000 to $131,273 for the 2011 tax year. (*Id.* at 16, 27.)

Berwick testified that, under the economic substance doctrine, transactions between related entities must be closely scrutinized – if a transaction has no purpose other than tax avoidance, it should be disallowed. (Def's Ex F.) She testified that she had concerns about the contract between AFD and Peksung because it was not signed, it did not state a price, and it was dated in December 2010. Berwick testified that she could not determine what Peksung received for its payments on behalf of AFD. She testified that, based on Plaintiff's testimony, it sounded as though the payments were *really* for the purchase or use of intangible assets, although she did not think the assets had value. Berwick testified that, to the extent the consulting fees were for Plaintiff's services, they should have been reported on a Form W-2 to Plaintiff. She testified that she did not think the payments of AFD's legal expenses were ordinary and necessary business expenses of Peksung. Berwick testified that if, as here, one company is paying the expenses of another related company, there is no benefit other than tax avoidance.

C.      *Plaintiff's Alternate Position and Amended Returns*

Davis testified that the income created by Peksung was used to pay Peksung's expenses, including AFD's consulting fees. She testified that Peksung's income, if not paid to AFD, could have been made available to Plaintiff. Davis testified that Plaintiff, as a shareholder of AFD, could have contributed the funds she received from Peksung to AFD and paid AFD's legal expenses. She testified that, assuming AFD had no income from Peksung, AFD would have

reported a loss. Davis testified that, in any event, the consulting fee income to AFD and the consulting fee expense to Peksung should match because they represent the same transaction.

Berwick testified that she thinks Plaintiff avoided tax by allowing Peksung to deduct AFD's expenses rather than paying taxes on her gain (net ordinary income) from Peksung. She testified that Plaintiff should have realized gain from Peksung and paid taxes on it; then, she could have contributed the funds to AFD or used them for any other purpose. Berwick agreed with Davis that if Peksung distributed earnings to its shareholder, Plaintiff, it would not be a taxable event unless the distribution was in excess of Plaintiff's basis. She also agreed with Davis that, assuming AFD had no income from Peksung, AFD would have reported losses. Berwick testified that AFD would report the losses and issue Schedules K-1, passing the losses on to its shareholder, Plaintiff; the losses would be deductible to the extent of Plaintiff's basis.

Davis testified that Plaintiff amended AFDs 2010 and 2011 returns after receiving Defendant's final audit adjustments to Peksung's returns disallowing the expenses; this was a protective amendment to preserve Plaintiff's claim. Berwick testified that Defendant does not accept amended returns when a return has already been audited. Berwick testified that the change Plaintiff made was to remove AFD's gross income, which was not previously audited.

## II. ANALYSIS

The issues presented for the 2010 and 2011 tax years are: (1) whether Peksung's payments on behalf of AFD constituted ordinary and necessary business expenses deductible by Peksung; and (2) if not, whether Peksung's payments on behalf of AFD may be recharacterized as a shareholder contribution to AFD rather than income to AFD.

The Oregon Legislature intended to "[m]ake the Oregon personal income tax law identical in effect to the provisions of the Internal Revenue Code relating to the measurement of

taxable income of individuals, estates and trusts, modified as necessary by the state's jurisdiction to tax and the revenue needs of the state[.]"  ORS 316.007(1); *see also* ORS 314.734(3) ("[i]n any case where it is necessary to determine the gross income of a shareholder for purposes of ORS chapter 316, such gross income shall include the shareholder's pro rata share of the gross income of the S corporation").[2]  "Any term used in this chapter has the same meaning as when used in a comparable context in the laws of the United States relating to federal income taxes, unless a different meaning is clearly required or the term is specifically defined in this chapter." ORS 316.012.  On the issues presented in this case, "Oregon law makes no adjustments to the rules under the Internal Revenue Code (IRC) and therefore, federal law governs the analysis." *See Porter v. Dept. of Rev.*, 20 OTR 30, 31 (2009); *see also* ORS 314.734(1) (the shareholder's pro rata share of S corporation income is computed taking into account the S corporation's separately stated items of income and deduction under IRC section 1366); *see also* ORS 314.732(2) (subject to certain exceptions, "the taxable income of an S corporation shall be computed pursuant to section 1363(b) of the [IRC], with the modifications, additions, and subtractions provided in this chapter and ORS chapter 316").

Deductions are "a matter of legislative grace" and taxpayers bear the burden of proving their entitlement to the deductions claimed.  *INDOPCO, Inc. v. Comm'r*, 503 US 79, 84, 112 S Ct 1039, 117 L Ed 2d 226 (1992).  "In all proceedings before the judge or a magistrate of the tax court and upon appeal therefrom, a preponderance of the evidence shall suffice to sustain the burden of proof.  The burden of proof shall fall upon the party seeking affirmative relief ∗ ∗ ∗."  ORS 305.427.  Plaintiff must establish her claim "by a preponderance of the evidence[,]" which "means the greater weight of evidence, the more convincing evidence."  *Feves v. Dept. of*

---

[2] The court's references to the Oregon Revised Statutes (ORS) are to 2009.

*Revenue*, 4 OTR 302, 312 (1971). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet [her] burden of proof * * *." *Reed v. Dept. of Rev.*, 310 Or 260, 265, 798 P2d 235 (1990). When a taxpayer appeals a deficiency assessment, "ORS 305.575 gives the Tax Court jurisdiction to determine the correct amount of that deficiency on grounds different from or other than those asserted by the department, and in an amount either less than or greater than the deficiency assessed by the department." *Hillenga v. Dept. of Rev.*, 358 Or 178, 185, 361 P3d 598 (2015).

A.     *Whether Peksung's Payments on Behalf of AFD Were Ordinary and Necessary Business Expenses of Peksung*

IRC section 162(a) allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." "To be 'necessary[,]' an expense must be 'appropriate and helpful' to the taxpayer's business. * * * To be 'ordinary[,]' the transaction which gives rise to the expense must be of a common or frequent occurrence in the type of business involved." *Boyd v. Comm'r*, 83 TCM (CCH) 1253, WL 236685 at *2 (2002) (internal citations omitted).

"In general, a taxpayer who pays another taxpayer's business expenses may not treat those payments as ordinary and necessary expenses incurred in the *payor's* business. * * * An exception exists for cases in which the taxpayer paid the other corporation's ordinary and necessary business expenses in order to 'protect or promote' the taxpayer's own business." *Menard, Inc. v. Comm'r*, 2004-207 TCM, WL 2066599 at *24 (2004), *rev'd in part on other grounds Menard, Inc. v. Comm'r*, 560 F3d 620 (7th Cir 2009) (citations omitted). The court uses a two-part test to determine whether payments are eligible for the exception: "(1) The taxpayer's primary motive for paying the expenses was to protect or promote the taxpayer's business, and

/ / /

(2) the expenditures constituted ordinary and necessary expenses in the furtherance or promotion of the taxpayer's business." *Id.* at *25, citing *Lohrke v. Comm'r*, 48 TC 679, 688 (1967).

In *Menard, Inc.*, Menard was the CEO and controlling shareholder of Menard, Inc. (Menards), a business "engaged in the retail sale of hardware, building supplies, paint, garden equipment and similar items[.]" WL 2066599 at *3-4. Menard was also the President and sole shareholder of Team Menard, Inc. (TMI), an S corporation engaged "in the business of engineering and racing Indianapolis-style race cars." *Id.* at *3, *6. During the tax years at issue, Menards "paid certain of TMI's expenses relating to TMI's operation of race cars[,] * * * but had no written agreement with TMI regarding the payment and/or reimbursement of the TMI expenses." *Id.* at *8. TMI promoted Menards' business by sending drivers and Indy cars to grand openings of new Menards stores and allowing the use of "images of TMI's Indy cars and logo." *Id.* at *9. Menard alleged that Menards and TMI had an oral sponsorship agreement pursuant to which Menards agreed to pay some of "TMI's racing expenses in exchange for 'all the benefits of the sponsorship.' " *Id.* at *24. The court concluded that "[t]he record contain[ed] no credible evidence of an oral sponsorship agreement between Menards and TMI." *Id.* at *25. The court applied the two-part *Lohrke* test and held that Menards could deduct the portion of the TMI expenses it paid that represented the reasonable fee for a race car sponsorship. *Id.* at *27.

The court finds the decision in *Menard, Inc.* to be instructive in this case. As in *Menard, Inc.*, Plaintiff was the controlling shareholder of two corporations, one of which paid the other's expenses during the tax years at issue. The first question is whether Peksung's primary motive for paying AFD's expenses was to protect or promote Peksung's business. To answer that question, the court must determine what benefit, if any, Peksung received in exchange for paying AFD's expenses. Peksung performed services for clients that originated with AFD and Peksung

collected payments from those clients. However, both Plaintiff and Davis testified that AFD neither sold its client list to Peksung, nor assigned its contracts to Peksung. In his Pretrial Brief, Plaintiff's counsel argued that the business purpose was "for Peksung's use, management and further development of this valuable asset – AFD's client base – for Peksung's benefit." (Ptf's Pretrial Br at 4.) At trial, Plaintiff's counsel suggested that AFD might have licensed the use of its client list to Peksung. The court finds that the only benefit Peksung received from AFD was the use of its client list; effectively, a license,[3] as Plaintiff's counsel suggested.

Several aspects of the arrangement between Peksung and AFD cast doubt on Plaintiff's contention that Peksung's primary motive for paying AFD's expenses was in exchange for use of AFD's client list. First, the payments from Peksung were not made in response to receiving an invoice from AFD, but rather were made as AFD's legal expenses came due. According to the account sheet, Peksung had a credit at several times during the 2010 and 2011 tax years because it had paid more of AFD's legal expenses than it owed to AFD. Second, AFD's invoices stated that a late fee would be imposed if an invoiced fee was not paid within 30 days. There is no evidence that a late fee was ever imposed on Peksung despite numerous instances in which invoiced fees remained unpaid for more than 30 days. Third, the written contract that was drafted to clarify and memorialize an existing oral agreement was vague and lacked details such as a fee. The fee may have been determined after the fact. Ultimately, the court finds that the primary motive for the payments was to ensure that AFD's legal expenses were paid.

The second question is whether the expenditures were ordinary and necessary expenses in the furtherance or promotion of Peksung's business. The reasons given by Plaintiff and Davis for Peksung's payments on behalf of AFD are somewhat confusing and suggested the payments

---

[3] Generally, a "license" is "**2.** [a] permission, usu. revocable, to commit some act that would otherwise be unlawful[.]" *Black's Law Dictionary* (10th ed 2014).

were for use of AFD's client list as well as for Plaintiff's services.  The court is unable to identify what services Peksung received from AFD.  However, the court is persuaded that payments to license or use a client list constitute an ordinary expense in Peksung's line of business.  Given that the payments were to a related party, the expenses are only *necessary* to the extent that the amount paid was reasonable.  *See Sparks Nugget, Inc. v. Comm'r*, 458 F2d 631 (9th Cir 1972), *cert denied* 410 US 928 (1973) ("it has been consistently held that payments in excess of reasonable rent made pursuant to an agreement between closely related parties which was not the product of arm's length negotiation are not deemed 'required' and thus are not deductible under [IRC] Section 162(a)(3)").  To determine what constitutes a reasonable amount, courts consider what expense would have been required in an "arm's length [transaction] with a stranger."  *Id.* at 635; *see also Menard, Inc.*, WL 2066599 at *31 (the court considered evidence of the sponsorship fees paid by TMI's other primary sponsors to determine a reasonable fee).

Plaintiff contends that Peksung paid AFD $20,000 per month.  The figure of $20,000 was determined by Plaintiff and Davis to represent an appropriate charge for Plaintiff's time and labor.  No evidence was presented to demonstrate the value of a license to use AFD's client list as of 2010 or 2011.  Typically, the value of a client list would bear some relationship to the revenue generated by the client list.  AFD's gross revenue was approximately $1.3 million in 2007 and approximately $309,000 in 2008.  AFD had no income in 2009.  That evidence suggests that AFD's client list was a valuable asset in 2007 and, to a lesser extent, in 2008.  AFD's client list probably had some value in 2010 and 2011, but the court is unable to determine the amount.  Even if the court were able to determine the reasonable value of AFD's client list, there is no evidence of the value of a license to use that list.  Plaintiff failed to meet her burden of

/ / /

proof on that issue. The court concludes that Peksung's payments of AFD's legal expenses were not a necessary business expense of Peksung.

B.      *Whether Peksung's Payments on Behalf of AFD may be Recharacterized as a Shareholder Contribution to AFD Rather than Income to AFD*

Plaintiff's alternate position is that Peksung's payments on behalf of AFD should be recharacterized as a shareholder contribution to AFD by its sole shareholder, Plaintiff:

> "If the funds were not a payment to AFD, as the Department asserts on the Peksung audit report, and if the funds are treated as wages paid to the shareholder, then the payment of the expense of AFD came from money of the shareholder (Plaintiff). Thus the shareholder must have had basis to deduct the losses created by AFD for the payment of its expenses."

(Ptf's Pretrial Br at 8.) Plaintiff maintains that treating the payments on behalf of AFD as income to AFD while disallowing the corresponding deduction for Peksung "creates a harsh and inconsistent tax result, and materializes a tax liability where none was necessary pursuant to the substance of the transaction as a payment between related corporations." (*Id.* at 7.) "In other words, the result of the adjustment was the inclusion of the same income twice to the Plaintiff, once when Peksung received it as its gross income, and once when AFD received it as a consulting fee * * *." *Id.*

1.      *Whether Peksung's payments on behalf of AFD resulted in a constructive distribution or wages to Plaintiff*

The form of the transactions at issue in this case – Peksung's payment of AFD's expenses – did not result in a direct transfer of funds to Plaintiff. However, as the court in *Menard, Inc.* explained:

> "Transfers of property from one corporation to a related corporation may constitute a constructive dividend to the corporations' common shareholder whether or not the shareholder directly receives any property. * * * The underlying theory is that the property passes from the transferor corporation to the

/ / /

common shareholder and then from the common shareholder to the transferee corporation as a capital contribution."

WL 2066599 at *32 (citations omitted).[4] "A dividend need not be formally declared or even intended by the corporation that pays it; all that is necessary is that the corporation confer an economic benefit on a shareholder without expectation of repayment and that the primary advantage of the transaction be to the shareholder's personal interests rather than to the corporation's business interests." *Jack's Maintenance v Comm'r*, 703 F2d 154, 156 (5th Cir 1983) (citations omitted); *see also* ORS 314.736 and IRC § 1368 (discussion distributions of property made by S corporations).

In *Menard, Inc.*, the court found that the difference between a reasonable sponsorship fee and the total amount of TMI's expenses paid by Menards constituted a constructive dividend to their controlling shareholder, Menard.[5] *Id.* at *33. The court found that Menard "directly and tangibly benefited from Menards's payment of the excess TMI expenses" because the payments "obviated the need for Mr. Menard to contribute from his personal resources and enhanced the value of Mr. Menard's 100-percent ownership interest." *Id.* As in *Menard, Inc.*, the court is persuaded that Plaintiff benefitted from Peksung's payment of AFD's expenses. If Peksung had not paid AFD's expenses, it would have had additional funds available for Plaintiff. In turn,

---

[4] "[T]ransactions between two corporations under common control can be treated as constructive distributions to the corporations' controlling shareholder, even though nothing passes directly to the shareholder." Bittker and Eustice, Federal Income Taxation of Corporation and Shareholders 8-56, (7th ed 2000). "These transactions have included purported loans, purported business expenses, purported purchases of assets, and outright diversions." *Id.* at 8-57 (citations omitted).

[5] The court in *Menard* identified two tests for "constructive dividend treatment": "(1) The objective distribution test, and (2) the subjective primary purpose test." WL 2066599 at *32. "The objective distribution test examines whether the transfer caused property to leave the transferor corporation's control, permitting the common shareholder to exercise direct or indirect control over the property through some other instrumentality, such as the transferee corporation." *Id.* "The subjective primary purpose test helps distinguish related corporations' regular business transactions from transfers intended primarily to benefit the common shareholder. * * * Although some business justification may exist for the property transfer, if the primary or dominant motivation was to benefit the common shareholder, and the shareholder received a direct and tangible benefit, the distribution is a constructive dividend." *Id.* (citations omitted).

Plaintiff could have used funds she received from Peksung to make a contribution to AFD to pay its expenses, but she did not do so because Peksung's paid AFD's expenses directly.

Upon disallowing Peksung's claimed expense deductions for consulting fees paid to AFD, Defendant increased officer compensation from Peksung to Plaintiff by $101,580 for the 2010 tax year and by $101,273 for the 2011 tax year. Plaintiff did not challenge Defendant's adjustments to officer compensation. Indeed, Plaintiff may have implicitly accepted them in her alternate position insofar as she argues that Peksung's income – if not paid directly to AFD – could have been made available to her. "[W]hen a corporation makes a payment to an individual who is both an employee and a shareholder, the payment must have been intended as compensation when made in order to be deductible as such." *Hood v. Comm'r*, 115 TC 172, 176 n5 (2000). Davis testified that the amount AFD billed to Peksung – $20,000 per month – was determined to be an appropriate charge for Plaintiff's time and labor. That testimony suggests that the purpose of the payments was, at least in part, to compensate Plaintiff for her work. The court finds that Peksung's payments on behalf of AFD in excess of the amounts recharacterized as officer compensation are properly considered distributions by Peksung to Plaintiff.

2.      *Whether Plaintiff contributed funds to AFD thereby increasing her basis in AFD*

Having found that Peksung made funds available to Plaintiff in the form of wages and distributions, the next question is whether Plaintiff contributed those funds to AFD resulting in an increase to her basis in AFD. "Generally, a shareholder in an S corporation has a tax basis in his stock equal to the amount of the contributions he makes to the capital of the S corporation, and the shareholder's capital contributions are not included in the income of the S corporation." *Nathel v. Comm'r*, 131 TC 262, 267 (2008), citing IRC §§ 118, 1016(a), 1371(a). "[A] taxpayer

/ / /

must make an 'economic outlay' in order to increase his basis in S corporation debt (or stock) * * *." *Maloof v. Comm'r*, 456 F3d 645, 649 (6th Cir 2006). That is the rule in "every circuit to consider the issue[.]" *Id.* at 650. The court is persuaded that Peksung's payment of AFD's legal expenses using funds to which Plaintiff was entitled as wages and distributions constituted an "economic outlay" by Plaintiff, thereby increasing her basis in AFD. Plaintiff's contributions to AFD are not included in AFD's income for the 2010 and 2011 tax years.

> 3. *Whether AFD's 2010 and 2011 returns may be amended as part of this appeal*

Plaintiff wrote that,

> "to protect the Plaintiff's position with regard to the consistent treatment of the consulting fees, and pursuant to the suggestion of the auditor, AFD amended its 2010 and 2011 Oregon corporate return – prior to the expiration of the statute of limitations – to reverse this consulting fee income and preserve the allowed deduction as a potential future loss. However, the taxpayer has not received any confirmation or clear indication that such amended returns were accepted by the Department, and so Plaintiff has proceeded in this case as if such returns were not accepted."

(Ptf's Pretrial Br at 8.) Berwick testified that Defendant does not accept amended returns when the original return was audited, which is the case with AFD's 2010 and 2011 returns. However, she noted that Defendant did not previously audit the income reported on AFD's 2010 and 2011 returns, only the expenses.

As discussed above, this court has jurisdiction to determine "the correct amount of [the] deficiency" under ORS 305.575. The correct amount of Plaintiff's deficiency for the 2010 and 2011 tax years is determined by taking into account items of income and loss that pass through to Plaintiff as the sole shareholder of the S corporations, AFD and Peksung. *See* ORS 314.734. Although AFD's 2010 and 2011 returns were audited by Defendant, AFD had no right of appeal from that audit. *See* ORS 314.732(1) ("Except as otherwise provided in ORS 314.740, 314.742 and 317.090, an S corporation shall not be subject to the taxes imposed by ORS chapter 316, 317

or 318"); (*see also* Ptf's Ex 4 at 1 (letter from Defendant to AFD stating, "[i]f you disagree with any part of these adjustments, a protest must be made by each corporation shareholder")).[6] The court concludes that AFD's 2010 and 2011 income may be adjusted in this appeal because it is necessary to determine the correct amount of Plaintiff's deficiency for those tax years.

### III. CONCLUSION

After careful consideration, the court concludes that, for the 2010 and 2011 tax years, the payments made by Peksung on behalf of AFD were not necessary expenses of Peksung and are not, therefore, deductible by Peksung. The court further concludes that, for the 2010 and 2011 tax years, Peksung's payments on behalf of AFD should be recharacterized as a shareholder contribution to AFD by Plaintiff rather than income to AFD. Now, therefore,

IT IS THE DECISION OF THIS COURT that, for the 2010 and 2011 tax years, Peksung's deductions for its payments on behalf of AFD for consulting fees are disallowed.

IT IS FURTHER DECIDED that, for the 2010 and 2011 tax years, Peksung's payments on behalf of AFD in excess of the amounts recharacterized as officer compensation are properly considered distributions by Peksung to Plaintiff.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[6] *See also* IRC §§ 1362 to 1377 (generally, items of S corporation income and loss pass through to the shareholders, and shareholders are taxed on their pro rata shares of the S corporation's income).

IT IS FURTHER DECIDED that, for the 2010 and 2011 tax years, Peksung's payments

on behalf of AFD shall be recharacterized as shareholder contributions to AFD.

Dated this ____ day of June, 2016.


_____
ALLISON R. BOOMER
MAGISTRATE

*If you want to appeal this Final Decision, file a complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within 60 days after the date of the Final Decision or this Final Decision cannot be changed. TCR-MD 19 B.*

*This document was filed and entered on June 28, 2016.*