In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 09-1699, 09-1861

R. DAVID BOYER,

*Plaintiff-Appellee/*
*Cross-Appellant,*

*v.*

CROWN STOCK DISTRIBUTION, INC., *et al.*,

*Defendants-Appellants/*
*Cross-Appellees.*

Appeals from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 1:06-CV-409—**Robert L. Miller, Jr.**, *Chief Judge*.

ARGUED OCTOBER 9, 2009—DECIDED NOVEMBER 18, 2009

Before POSNER, ROVNER, and WILLIAMS, *Circuit Judges*.

POSNER, *Circuit Judge*. These appeals arise from the Chapter 7 bankruptcy of Crown Unlimited Machine, Inc. The trustee in bankruptcy filed an adversary action charging the defendants—a defunct corporation and its shareholders, members of a family named Stroup—with

having made a fraudulent conveyance in violation of Ind. Code § 32-18-2-14(2) (section 4(a)(2) of the Uniform Fraudulent Transfer Act), a statute enforceable in a bankruptcy proceeding. See 11 U.S.C. § 544(b). After an evidentiary hearing, the bankruptcy judge awarded the trustee $3,295,000 plus prejudgment interest. The district judge affirmed and the defendants have appealed. The trustee has cross-appealed, seeking an additional $590,328.

Crown was a designer and manufacturer of machinery for cutting and bending tubes. Most of the machinery it made was custom-designed to the buyer's specifications, and only two other companies manufactured custom-designed machinery of that type. In January 1999 the defendants agreed to sell all of Crown's assets to Kevin E. Smith, the president of a company in a similar line of business. The price was $6 million. Crown agreed to employ Smith until the closing, so that he could assure himself of the value of the business before committing to buying it. He decided to go through with the deal. At the closing, on January 5, 2000, Crown received from a new corporation, formed by Smith, $3.1 million in cash and a $2.9 million promissory note. The new corporation (also named Crown Unlimited Machine, Inc., the name being among the assets sold to the new Crown) had borrowed the $3.1 million from a bank. Although the loan was secured by all of Crown's assets, the annual interest rate (a floating rate) initially exceeded 9 percent. The rate suggests—since inflation expectations were low at the time—that the bank considered the risk of default nontrivial.

The promissory note was payable on April 1, 2006, with interest at an annual rate of 8 percent. Although that translates into an interest expense of $232,000 a year, the agreement of sale specified that the new corporation would be required to pay only $100,000 a year on the note, with the first payment due in April 2001, unless new Crown's sales exceeded a specified high threshold. The note, like the bank loan, was secured by all of Crown's assets, but the promisee's (old Crown's) security interest was subordinated to the bank's. Although the interest rate on the note was lower than the interest rate on the bank loan, even though the note was not as well secured, there was, as we'll see, little chance that the note would ever be paid; and after the first two $100,000 interest payments, it wasn't.

Smith's personal assets were meager. He contributed only $500 of his own money toward the purchase.

Just prior to the closing, old Crown transferred $590,328 from its corporate bank account to a separate bank account so that it could be distributed to Crown's shareholders as a dividend. This was done pursuant to an understanding of the parties that, depending on the company's performance between the initial agreement and the closing, the Stroups would be permitted to keep some of Crown's cash that would otherwise have been transferred to the new corporation as part of the sale; the sale, since it was of all of Crown's assets, included whatever money was in the corporation's bank account.

After the closing, old Crown (renamed Crown Stock Distribution, Inc.) distributed the entire $3.1 million in

cash that it had received to its shareholders, and ceased to be an operating company.

New Crown was a flop. It declared bankruptcy in July 2003, and its assets were sold pursuant to 11 U.S.C. § 363 (which authorizes a sale, if approved by the bankruptcy judge, of assets of the debtor) for $3.7 million. The buyer was a new company of which Smith is now the president. Most of the money realized in the sale was required for paying off the bank; very little was left over to pay the claims of new Crown's unsecured creditors, who were owed some $1.6 or $1.7 million and on whose behalf the trustee in bankruptcy brought the adversary action. The action was timely, despite the length of time since the alleged fraudulent conveyance, because the bankruptcy petition was filed within the four-year "look back" period of the Uniform Fraudulent Transfer Act, Ind. Code § 32-18-2-19(2), and the trustee initiated this suit within the period specified in 11 U.S.C. § 546 for bringing a section 544 avoidance action and the one-year deadline for bringing a section 550 action to recover improperly transferred funds, a deadline that runs from the date on which the transfer was set aside. 11 U.S.C. § 550(f)(1).

The bankruptcy judge ruled that the $6 million that new Crown had paid (the $3.1 million in cash), or obligated itself to pay (the $2.9 million promissory note), for old Crown's assets had been paid "without [new Crown's] receiving a reasonably equivalent value in exchange." As a result, New Crown had embarked upon "a business . . . for which [its] remaining assets . . . were 'unreasonably small in relation to the business,'" in the

language of the Uniform Fraudulent Transfer Act. The judge did not think the assets, including intangible assets such as goodwill that made old Crown a going concern and not just a pile of machinery, had been worth more than $4 million tops on the date of the closing. And he thought that new Crown had been so depleted by the debt it had taken on that it had been, in his words, on "life support" from the get-go. So old Crown and its shareholders could neither enforce the promissory note nor keep either the $3.1 million in cash received at the closing or the two $100,000 interest payments made on the note.

But the $590,328 dividend, the judge ruled, was legitimate, because it had been paid out of cash that belonged to old Crown rather than to the debtor (new Crown). In so ruling he rejected the trustee's argument that the purchase of old Crown's assets had been an LBO (a leveraged buyout), that it should be "collapsed" and the sale thus recharacterized as a sale by the shareholders of old Crown, and that once it was collapsed in this fashion the $590,328 "dividend" would be seen as an asset of the debtor's estate and thus would be available to help satisfy the claims of the unsecured creditors. If the transaction was not collapsed—and the bankruptcy judge thought it should not be because he refused to recharacterize the sale of assets as an LBO—the debtor was not entitled to the return of the dividend because, when it was paid, the money out of which it was paid belonged to old Crown.

We begin our analysis with the trustee's argument for recharacterizing the transaction. In a conventional

LBO, an investor (often consisting of the corporation's managers) buys the stock of a corporation from the stockholders with the proceeds of a loan secured by the corporation's own assets. *In re Image Worldwide, Ltd.*, 139 F.3d 574, 580 (7th Cir. 1998); *In re EDC, Inc.*, 930 F.2d 1275, 1278 (7th Cir. 1991); *Mellon Bank, N.A. v. Metro Communications, Inc.*, 945 F.2d 635, 645-46 (3d Cir. 1991). It follows that if all the assets are still fully secured when the corporation declares bankruptcy, the unsecured creditors cannot satisfy any part of their claims from a sale of the assets. If the trustee loses this suit, the unsecured creditors will have recovered only $150,000—less than 10 cents on the dollar.

Should the acquired company be doomed to go broke after and because of the LBO—if the burden of debt created by the transaction was so heavy that the corporation had no reasonable prospect of surviving—the payment to the shareholders by the buyer of the corporation is deemed a fraudulent conveyance because in exchange for the money the shareholders received they provided no value to the corporation but merely increased its debt and by doing so pushed it over the brink. *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 635-37 (2d Cir. 1995); *Moody v. Security Pacific Business Credit*, 971 F.2d 1056, 1063-64 (3d Cir. 1992); *Mellon Bank, N.A. v. Metro Communications, Inc.*, *supra*, 945 F.2d at 645-46; *United States v. Tabor Court Realty Corp.*, 803 F.2d 1288, 1297 (3d Cir. 1986). A corporate transfer is "fraudulent" within the meaning of the Uniform Fraudulent Transfer Act, even if there is no fraudulent intent, if the corporation didn't receive "reasonably equivalent value" in

return for the transfer and as a result was left with insufficient assets to have a reasonable chance of surviving indefinitely. Ind. Code § 32-18-2-14(2); *Rose v. Mercantile National Bank*, 844 N.E.2d 1035, 1053-54 (Ind. App. 2006), vacated in part on other grounds, 868 N.E.2d 772 (Ind. 2007); see also *Donnell v. Kowell*, 533 F.3d 762, 770-71 (9th Cir. 2008).

Some courts have been reluctant to apply the Act as written to leveraged buyouts. See *Kupetz v. Wolf*, 845 F.2d 842, 847-50 (9th Cir. 1998); *United States v. Tabor Court Realty Corp., supra*, 803 F.2d at 1297; *Wieboldt Stores, Inc. v. Schottenstein*, 94 B.R. 488, 503 (N.D. Ill. 1988). They sympathize with minority shareholders who have no power to prevent such a deal. They may also agree with the scholars who have argued that many LBOs are welfare-enhancing transactions because by making the managers owners (managers are often the buyers in an LBO) and thus fusing ownership with control, an LBO increases the managers' incentive to operate the corporation with a view to maximizing its value rather than their salaries and perks. These scholars also argue that devices that facilitate transfers of corporate control increase the mobility of capital. See Bengt Holmstrom & Steven N. Kaplan, "Corporate Governance and Merger Activity in the United States: Making Sense of the 1980s and 1990s," *Journal of Economic Perspectives*, Spring 2001, pp. 121, 128; Steven N. Kaplan & Jeremy C. Stein, "The Evolution of Buyout Pricing and Financial Structure in the 1980s," 108 *Quarterly Journal of Economics* 313, 340-44 (1993); Douglas G. Baird, "Fraudulent Conveyances, Agency Costs, and Leveraged Buyouts," 20 *Journal of*

*Legal Studies* 1, 8-9 (1991); Frank H. Easterbrook, "High-Yield Debt as an Incentive Device," 11 *International Review of Law & Economics* 183 (1991); Douglas G. Baird & Thomas H. Jackson, "Fraudulent Conveyance Law and Its Proper Domain," 38 *Vand. L. Rev*. 829, 830-35, 850-54 (1985).

The reluctance of the courts in the decisions we cited is not easy to square with the language of the Uniform Fraudulent Transfer Act. And anyway the "equities," as we shall see, do not favor lenient treatment in this case. Moreover, although before the LBO Smith was briefly a member of Crown's management, the LBO did not close a gap between managers and shareholders. LBOs, though by burdening the acquired corporation with additional debt they increase the risk of bankruptcy (because debt is a fixed cost, and therefore unlike a variable cost does not shrink when the debtor's output shrinks), can indeed have redeeming economic value when the corporation is publicly held and the managers have a low equity stake prior to the transaction. In a publicly held corporation there is a separation of ownership from control, and the managers may use their control to manage the company in a way that will increase their personal wealth rather than maximize the profits of the corporation. The conflict of interest is eliminated by making the managers the owners. But this rationale for an LBO is missing from this case because both old and new Crown were closely held corporations. And while the economic literature also argues that the increased risk of bankruptcy that an LBO creates concentrates the minds of

the managers (just as, according to Samuel Johnson, the prospect of being hanged concentrates the mind of the condemned person), this is hard to take seriously in the present case; for the owner-manager had only a $500 stake in the company.

But the critical difference between the LBO in this case and a bona fide LBO is that this LBO was *highly* likely to plunge the company into bankruptcy. There was scant probability that the transaction would increase the firm's value; on the contrary, it left the firm with so few assets that it would have had to be extremely lucky to survive.

The transaction differed, however, in two formal respects from a conventional LBO: the buyer bought the assets of the corporation, rather than stock in the corporation; and despite a load of debt and a dearth of cash, the corporation limped along for three-and-a-half years before collapsing into the arms of the bankruptcy court. The defendants urge these as grounds for not reclassifying the asset purchase as an LBO.

Now whether one calls it an LBO or not is not critical, although both the bankruptcy court and the defendants thought it was. Some LBOs are legitimate; others are fraudulent conveyances. "[F]raudulent conveyance doctrine . . . is a flexible principle that looks to substance, rather than form, and protects creditors from any transactions the debtor engages in that have the effect of impairing their rights, while ensuring that the debtor can continue to do business and assuring third parties that transactions done with the debtor at arm's length

will not be second-guessed." Douglas G. Baird, *Elements of Bankruptcy* 153-54 (4th ed. 2006). If the dividend was part and parcel of the transaction that fatally depleted new Crown's assets, it was part and parcel of a fraudulent conveyance. But if one has to call the overall transaction something, the something is an LBO.

The first formal difference to which the defendants point is of no conceivable significance. An LBO can take the form of an asset acquisition, *In re OODC, LLC*, 321 B.R. 128, 137-38 (Bankr. D. Del. 2005); 4 *Norton Bankruptcy Law & Practice*, § 68:2 (3d ed. 2008); see also *In re Aluminum Mills Corp.*, 132 B.R. 869, 878 (Bankr. N.D. Ill. 1991), as the defendants' lawyer conceded at argument. The purchase was nominally of the assets of old Crown, but actually of the ownership of the company; for old Crown distributed the money it received in the sale forthwith to its shareholders and from then on existed only as a shell. New Crown operated under the same name as its predecessor, and its trade creditors and other unsecured creditors were not even told about the transaction. That reticence would be normal if the stock of a corporation were sold, rather than its assets; but in a sale of its assets, the seller's creditors would expect to be notified that they would henceforth be dealing with a different firm.

New Crown staved off bankruptcy for several years and might have staved it off longer had it not been for mistakes made by Smith in running the business. (His biggest mistake was shifting from the production of custom-designed to standardized machinery, a market in which new Crown faced competition from hundreds of

firms rather than from just two.) But to assess the significance of this point one must distinguish between insolvency and the acknowledgment of insolvency and between insolvency and a lack of adequate capital. A firm might be insolvent in the bankruptcy sense of negative net worth—its liabilities exceeded its assets, 11 U.S.C. § 101(32)(A); *Buncher Co. v. Official Committee of Unsecured Creditors of Genfarm Limited Partnership IV*, 229 F.3d 245, 251 (3d Cir. 2000); Baird, *Elements of Bankruptcy*, *supra*, at 10—yet it might continue operating as long as it was able to raise enough money to pay its debts as they became due, or even longer if its creditors were forbearing.

By encumbering all the company's assets, the sale reduced its ability to borrow on favorable terms, as it could offer no collateral to lenders. And by surrendering most of old Crown's cash (the cash that was paid as a dividend) and obligating itself to pay $100,000 a year to the defendants and $495,000 a year to service the $3.1 million bank loan, without receiving anything in return except Smith's $500, new Crown was forced to engage in continual borrowing during its remaining life, and on unfavorable terms. Seven months before it declared bankruptcy it had run up $8.3 million in debt and its assets were worth less than half that amount.

New Crown thus had made payments and incurred obligations without receiving "reasonably equivalent value" in return. Even if it was not actually insolvent *ab initio*, as a result of the lack of equivalence it began life with "unreasonably small" assets given the nature of its

business. That was what the bankruptcy judge meant when he said that new Crown survived as long as it did only on "life support." That was a finding of fact to which we defer.

The difference between insolvency and "unreasonably small" assets in the LBO context is the difference between being bankrupt on the day the LBO is consummated and having at that moment such meager assets that bankruptcy is a consequence both likely and foreseeable. *Moody v. Security Pacific Business Credit, supra*, 971 F.2d at 1069-70, 1072-73; *Kipperman v. Onex Corp.*, 411 B.R. 805, 836 (N.D. Ga. 2009). Focusing on the second question avoids haggling over whether at the moment of the transfer the corporation became "technically" insolvent, a question that only accountants could relish having to answer. *Moody v. Security Pacific Business Credit, supra*, 971 F.2d at 1070 n. 22; Bruce A. Markell, "Toward True and Plain Dealing: A Theory of Fraudulent Transfers Involving Unreasonably Small Capital," 21 *Ind. L. Rev.* 469, 498 (1988).

But one has to be careful with a term like "unreasonably small." It is fuzzy, and in danger of being interpreted under the influence of hindsight bias. One is tempted to suppose that because a firm failed it must have been inadequately capitalized. The temptation must be resisted. See *Kipperman v. Onex Corp., supra*, 411 B.R. at 836; *Fidelity Bond & Mortgage Co. v. Brand*, 371 B.R. 708, 723 (E.D. Pa. 2007); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995); Baird, "Fraudulent Conveyances, Agency Costs, and Leveraged Buyouts," *supra*, at 18. As we said in a related

context in *Baldi v. Samuel Son & Co.*, 548 F.3d 579, 582 (7th Cir. 2008), "of course many start-ups fail, but if a significant probability of failure sufficed to pronounce a start-up insolvent, how would any start-up finance its operations?" But new Crown started life almost with no assets at all, for all its physical assets were encumbered twice over, and the dividend plus new Crown's interest obligations drained the company of virtually all its cash. It was naked to any financial storms that might assail it. So the statutory condition for a fraudulent conveyance was satisfied—or so at least the bankruptcy judge could and did find without committing a clear error.

The fact that mistakes by the buyer hastened the company's demise is not a defense. Whether a transfer was fraudulent when made depends on conditions that existed when it was made, not on what happened later to affect the timing of the company's collapse. *Moody v. Security Pacific Business, supra*, 971 F.2d at 1073; *In re Morse Tool, Inc.*, 148 B.R. 97, 133-34 (Bankr. D. Mass. 1992); *In re O'Day Corp.*, 126 B.R. 370, 407 (Bankr. D. Mass. 1991). Not that the length of the interval between the LBO and the collapse is irrelevant to determining the effect of the transfer. It is pertinent evidence. The longer the interval, the less likely that the collapse was fated at the formation of the new company, although we are skeptical of cases that can be read to suggest that ten or twelve months is a long enough interval to create a presumption that the terms of the LBO were not responsible for the company's failure. *Moody v. Security Pacific Business Credit, Inc., supra*, 971 F.2d at 1073-74; *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Services Co., supra*, 910 F. Supp. at 944;

*In re Joy Recovery Technology Corp.*, 286 B.R. 54, 76 (Bankr. N.D. Ill. 2002); *In re Ohio Corrugating Co.*, 91 B.R. 430, 440 (Bankr. N.D. Ohio 1988). An inadequately capitalized company may be able to stagger along for quite some time, concealing its parlous state or persuading creditors to avoid forcing it into a bankruptcy proceeding in which perhaps only the lawyers will do well.

The interval was longer than in previous cases, but the defendants are unable to sketch a plausible narrative in which new Crown could have survived indefinitely despite being cash starved as a result of the terms of the LBO that brought it into being. The fact that Smith made mistakes in running the company does not weigh as strongly as the defendants think. Everyone makes mistakes. That's one reason why businesses need adequate capital to have a good chance of surviving in the Darwinian jungle that we call the market.

The "dividend" was an integral part of the LBO, although the trustee stumbled by failing to present evidence concerning old Crown's dividend policy. Family-owned companies rarely pay dividends, but instead channel profits into salary in order to avoid double taxation. E.g., *Menard, Inc. v. Commissioner*, 560 F.3d 620, 621-22 (7th Cir. 2009); *Exacto Spring Corp. v. Commissioner*, 196 F.3d 833, 834, 838 (7th Cir. 1999); *Haffner's Service Stations, Inc. v. Commissioner*, 326 F.3d 1, 3 (1st Cir. 2003). Had this been shown to be true of old Crown it would have clinched the case for the trustee. But we do know that at least four of old Crown's shareholders were officers or directors and so presumably were salaried. We know as

well that the dividend represented 50 percent of Crown's 1999 profits, which was unreasonably high given the cash needs of the business. Crown's owners drained it of cash—all unbeknownst to the corporation's present and future unsecured creditors. These indications that the dividend was part of the fraudulent transfer rather than a normal distribution of previously earned profits—that it wasn't an ordinary dividend but rather the withdrawal of an asset vital to the acquiring firm—were sufficient to place a burden on the defendants of producing evidence that it was a bona fide dividend, a burden they failed to carry.

They make a desperate argument that the $2.9 million promissory note that new Crown issued to old Crown was worth very little from the start—that there was never any reasonable expectation that it would be paid. (In the event, only $200,000, representing the first two installments of interest, *was* paid.) They say that therefore they were really selling the company for only $3.1 million, and it was worth that much. This is virtually a confession that the purpose of the note was to make sure that the unsecured creditors would never be able to get at the corporation's assets in the event of bankruptcy; any money left over after the bank loan was repaid would inure to old Crown's shareholders. True, the note was issued to the shell of old Crown; but any money paid on it would flow through to the other defendants (the shareholders), as had the initial $3.1 million payment and the two $100,000 interest payments.

Determining that the transfer of assets to new Crown was fraudulent was only the first stage of the adversary

action. The second stage was to restore to new Crown (which is to say the trustee) the money that new Crown had paid for the Crown assets. The bankruptcy judge based the award of that money to the trustee on section 550 of the Bankruptcy Code, which defines the right of the trustee in bankruptcy to recover money transferred in a transaction that he is authorized by section 544 to nullify, as the trustee in this case was. *In re International Administrative Services, Inc.*, 408 F.3d 689, 703-04 (11th Cir. 2005). Section 550(b)(2) denies recovery of property that was transferred to "any immediate or mediate good faith transferee" of the initial transferee of a fraudulent transfer if the subsequent transferee took for value and "in good faith and without knowledge of the voidability of the transfer avoided." § 550(a)(2). If the asset sale is recharacterized as a sale of old Crown by its shareholders, as is implicit in our characterization of the sale as an LBO (remember that a conventional LBO is a stock acquisition), the shareholders lose the protection of section 550(b) because they then are initial rather than subsequent transferees and the "dividend"—the retention of cash by old Crown—becomes an adjustment in the purchase price. But we are now considering the bankruptcy judge's theory.

If the transaction is not collapsed, the initial transferee of the $3.3 million was old Crown and the second-stage transferees were the shareholders. But they gave no "value" in the transfer and so are not protected by section 550(b). As the bankruptcy judge put it, "the individual defendants gave nothing in exchange for their distributions from Crown Stock. Those distributions

were made, not in return for some exchange of property or services, or the payment of an antecedent debt, but solely on account of their status as shareholders of the company."

We would have a different case if the trustee were going against someone who had sold a shareholder of old Crown a boat that the shareholder paid for out of his share of the proceeds of the sale of the company. The seller of the boat, assuming he had no reason to know that the money he was receiving didn't really belong to the buyer, would be protected by section 550(b)(2). "If the recipient of a fraudulent conveyance uses the money to buy a Rolls Royce, the auto dealer need not return the money to the bankrupt even if the trustee can identify the serial numbers on the bills. The misfortune of the firm's creditors is not a good reason to mulct the dealer, who gave value for the money and was in no position to monitor the debtor." *Bonded Financial Services, Inc. v. European American Bank*, 838 F.2d 890, 892 (7th Cir. 1988); see also *Rupp v. Markgraf*, 95 F.3d 936, 938 (10th Cir. 1996); *In re M. Blackburn Mitchell Inc.*, 164 B.R. 117, 123 (Bankr. N.D. Cal. 1994).

The defendants argue that even if their receipt of the $3.3 million (plus the dividend) was voidable, they shouldn't have to return any of it because that would give the trustee a windfall. Old Crown sold new Crown assets that new Crown later sold in bankruptcy for $3.7 million. If old Crown gets no credit for the initial transfer, the debtor's estate will have received in excess of $7.6 million, consisting of the amount of the judgment

($3.295 million) plus the proceeds of the sale of the assets ($3.7 million), plus the dividend money (almost $600,000)—all to pay (besides administrative expenses) total debts of only $5.2 or $5.3 million: $3.6 million to the bank (the original bank loan, plus an additional $500,000 that the bank lent new Crown, all of which has been repaid to the bank), and $1.6 or $1.7 million to the unsecured creditors.

There will be no windfall. When we asked the trustee's lawyer at argument who would be entitled to money obtained by him in excess of what new Crown's creditors are owed, he surprised us (he is a bankruptcy lawyer, after all) by saying he didn't know. The answer is the debtor, 11 U.S.C. § 726(a)(6); *In re Thompson*, 965 F.2d 1136, 1144 n. 12 (1st Cir. 1992); *Evans v. FDIC*, 981 F.2d 978, 979-80 (8th Cir. 1992); *In re Riverside-Linden Investment Co.*, 925 F.2d 320, 323 (9th Cir. 1991) (per curiam)—but only in the first instance. Although the debtor is new Crown rather than old Crown, the fact that the debtor receives any surplus obtained by the trustee in his efforts to maximize the debtor's estate doesn't mean that the money stays there. It can't stay there for long, since the estate is dissolved at the conclusion of the bankruptcy proceeding. The ultimate recipients of assets remaining in the estate when it is closed depend on state law, *In re FBN Food Services, Inc.*, 82 F.3d 1387, 1395-96 (7th Cir. 1996), because any federal interest has been exhausted. But as far as we can tell, should all the unsecured creditors of new Crown be paid in full the only other potential claimants to any surplus money in its estate will be the original share-

holders. The LBO was fraudulent only with respect to the unsecured creditors. If and when they are paid in full, the wrong committed by the shareholders will have been righted and there will no reason to deny their claims to whatever money is left over. *Kitts v. Willson*, 39 N.E. 313, 315 (Ind. 1894); *Estates of Kalwitz v. Kalwitz*, 717 N.E.2d 904, 910 (Ind. App. 1999); *Morgan v. Catherwood*, 167 N.E. 618, 622 (Ind. App. 1929).

Another way to put this is that only a creditor can set aside a fraudulent conveyance. *Estates of Kalwitz v. Kalwitz*, *supra*. And a third way is that our reclassification of the sale of assets as an LBO unravels the sale, because the ostensible buyer paid nothing (well, $500), having bought the company with the company's own assets. Since the sale is to be ignored, any money received from the sale of the company's assets that is not owed to a creditor belongs to the original shareholders.

The defendants make some other arguments, but they do not require discussion. The trustee is entitled to the judgment awarded by the bankruptcy judge, plus the $590,328 dividend. After the claims of all creditors have been satisfied and the costs of administering the bankruptcy paid, any money remaining in the hands of the trustee must be returned to the defendants. The judgment of the district court is therefore affirmed in part and reversed in part (the part relating to the dividend), and the case remanded for further proceedings consistent with this opinion.