T.C. Memo. 2011-74

UNITED STATES TAX COURT

MULCAHY, PAURITSCH, SALVADOR & CO., LTD. f.k.a. MULCAHY,
PAURITSCH & COMPANY, LTD., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4901-08.                    Filed March 31, 2011.

Albert L. Grasso and David B. Shiner, for petitioner.

Naseem J. Khan, James Cascino, and Judah Fish (student), for
respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, Judge:  In a notice dated December 5, 2007,
respondent (whom we refer to here as the IRS) determined
deficiencies in the federal income tax of petitioner (whom we

refer to here as the firm).[1]  The IRS determined the following deficiencies in tax:  $317,729 for 2001, $284,505 for 2002, and $377,247 for 2003.  The IRS also determined that the firm was liable for accuracy-related penalties under section 6662 in the following amounts:  $63,546 for 2001, $56,901 for 2002, and $73,238 for 2003.[2]  The firm disputes these determinations.

FINDINGS OF FACT

The Firm, Shareholders, and Related Entities

    The firm is an accounting and consulting firm with its principal place of business in Orland Park, Illinois.  The firm was founded in 1979 by Edward W. Mulcahy, Michael F. Pauritsch, and Philip A. Salvador.  We refer to the three men collectively as the founders.  Throughout the years in issue--2001, 2002, and 2003--the founders served as the firm's board of directors and sole officers.  The founders also served as the only members of the firm's compensation committee, which determined what the firm paid its employees, officers, and board members.  The firm was a C corporation and a cash-basis taxpayer; it used a calendar year for its taxable year.

---

[1]Petitioner's full name is "Mulcahy, Pauritsch, Salvador & Co., Ltd."  This case also involves a related entity named MPS Limited.  To avoid confusion, we refer to petitioner as "the firm" and the related entity as "MPS Ltd."

[2]All section references are to the Internal Revenue Code, as amended and effective during the years at issue.  All Rule references are to the Tax Court Rules of Practice and Procedure.

From October 1, 2002 through the end of 2003,[3] the firm was owned by six shareholders, and their ownership percentages[4] were as follows:

| | |
|---|---|
| Edward W. Mulcahy | 26% |
| Michael F. Pauritsch | 26% |
| Philip A. Salvador | 26% |
| Edward T. McCormick | 11% |
| Glenn E. Byline | 5% |
| David Kobza | 5% |

We refer to McCormick, Byline, and Kobza as the minority shareholders.  Kobza became a shareholder in 2002.  No shareholders were related by blood or marriage.

At issue is the deductibility of payments the firm made to three related entities:  Financial Alternatives, Inc. (Financial Alternatives), PEM & Associates (PEM), and MPS Limited (MPS Ltd.).  We refer to the three entities collectively as the related entities.

The sole shareholders of Financial Alternatives were the founders (Mulcahy, Pauritsch, and Salvador).  The founders owned Financial Alternatives in equal shares.  Financial Alternatives was a C corporation that used a taxable year ending June 30.  It

---

[3]The record is incomplete regarding the ownership percentages before October 1, 2002.

[4]The shareholding percentages listed are rounded to the nearest percentage point.

filed Forms 1120, U.S. Corporation Income Tax Return, for taxable years ending June 30, 2002, 2003, and 2004.

The founders also owned PEM in equal shares.  PEM was a general partnership.  It filed Forms 1065, U.S. Return of Partnership Income, for taxable years 2001, 2002, and 2003.

Mulcahy and Salvador owned MPS Ltd. in equal shares, but Pauritsch was not an owner.  MPS Ltd. was a limited liability company filing as a C corporation.  It filed Forms 1120 for taxable years 2002 and 2003.

The related entities did not perform any services for the firm in the years at issue.  The founders performed various services for the firm, including accounting, consulting, and management services.  The firm's other employees (there were approximately 40 throughout the years at issue) performed both accounting and consulting services for the firm.

Payments by the Firm:  "Consulting fees", Compensation, and Interest Expense

The firm paid the founders the following amounts, which it designated as compensation:

| Year | Mulcahy | Pauritsch | Salvador | Total |
|------|---------|-----------|----------|-------|
| 2001 | $106,175 | $99,074 | $117,824 | $323,073 |
| 2002 | 103,156 | 96,376 | 106,376 | 305,908 |
| 2003 | 102,662 | 95,048 | 112,086 | 309,796 |

The firm made a number of payments to the related entities that it designated as "consulting fees".  It now claims that

these payments were compensation for the services of the founders.[5]  It paid PEM, as "consulting fees", $136,570 in 2001, $147,837 in 2002, and $81,467 in 2003.[6]  It paid Financial Alternatives, as "consulting fees", $755,000[7] in 2001, $468,306

---

[5]Note that if the firm had made payments to the founders that were profit distributions (besides the "consulting fee" payments, which the IRS contends were profit distributions), this would plausibly point in favor of characterizing the "consulting fee" payments as compensation for services.  The firm does not contend that there were any profit distributions.

Note also that if the firm had made other payments to the founders for their services, besides the amounts paid directly to the founders as compensation and the amounts paid as "consulting fees" to the related entities (fees the firm contends were payments in exchange for the founders' services), this would plausibly point in favor of characterizing the "consulting fee" payments as profit distributions.  The IRS does not contend that there were any other payments for the founders' services.

[6]The firm also made payments it designated as rent to PEM in the following amounts:  $127,750 in 2001, $153,300 in 2002, and $127,750 in 2003.  It paid the amounts in installments of $12,750.  The firm paid PEM each month during 2001 through 2003, except the following months:  January 2001, December 2001, January 2003, and April 2003.  Neither party argued that any part of the amounts designated as rent was a distribution to the founders or compensation for the founders' services.  As discussed below, the firm also paid $46,541.95 that it designated as an interest expense to PEM in 2003.  As discussed below, the firm claimed a deduction of $34,421--which is the sum of two of the three payments it designated as interest expenses in 2003.  The firm now argues that the $34,421 is additional compensation for the founders' services.

[7]In its petition the firm asserted that it paid "consulting fees" of $775,000 to Financial Alternatives in 2001.  We find that it paid only $755,000 because (i) the canceled check evidencing the payment to Financial Alternatives was for $755,000, not $775,000; (ii) the firm did not object to the IRS' proposed finding of fact that it paid Financial Alternatives $755,000, not $775,000; and (iii) Financial Alternatives reported
(continued...)

in 2002, and $610,524 in 2003.  And it paid MPS Ltd., as "consulting fees", zero in 2001, $250,000 in 2002, and $301,537 in 2003.[8]  To summarize, we find the firm paid the following amounts to the related entities, which it designated as "consulting fees":

| Year | Financial Alternatives | PEM | MPS Ltd. | Total |
|------|------------------------|-----|----------|-------|
| 2001 | $755,000 | $136,570 | -0- | $891,570 |
| 2002 | 468,306 | 147,837 | $250,000 | 866,143 |
| 2003 | 610,524 | 81,467 | 301,537 | 993,528 |

The firm paid PEM throughout the year and paid Financial Alternatives and MPS Ltd. at the end of each year.  Salvador determined the amounts of the payments to Financial Alternatives and MPS Ltd. by setting the total amounts of these payments equal to the cash the firm had on hand at the end of the year.  He did this for tax planning reasons.  The result of removing all the cash on hand was to reduce the taxable income that the firm reported to zero (or near zero).

---

[7](...continued)
only $755,000 in gross receipts on its tax year ending June 30, 2002.

[8]For the amounts paid to Financial Alternatives and PEM, the firm provided canceled checks as evidence of the payment.  It did not offer canceled checks for the payments to MPS Ltd., but it offered testimony that the payments were made and a copy of its general ledger showing the payments.  We find this evidence credible.

The compensation committee allocated the firm's payments to the related entities among the founders according to the hours each founder worked for the year.  The related entities in turn paid the founders according roughly to the committee's allocation.  The payments to each founder by the related entities were thus proportionate to his hours worked in relation to the other founders and not to his shareholdings.  The allocations were as follows:

| Year | Mulcahy | Pauritsch | Salvador | Total |
|------|---------|-----------|----------|-------|
| 2001 | $286,954 | $285,240 | $339,376 | [1]$911,570 |
| 2002 | 360,698 | 132,373 | 373,072 | 866,143 |
| 2003 | 451,723 | 93,457 | 448,348 | 993,528 |

[1]The firm included in the amounts that it allocated to its founders the $20,000 that it claims to have paid to Financial Alternatives but that we find it did not in fact pay.  See supra note 7.  Hence the total allocation for 2001 is $20,000 more than the amount we find the firm paid to the related entities.

Besides the amounts paid to PEM as "consulting fees", in 2003 the firm paid PEM $34,421, which it designated as an "interest expense".[9]

[9]The $34,421 is in issue because, as discussed below, the IRS disallowed the firm's deduction of that amount.  The firm paid another $12,300.73 on June 25, 2003, which it designated as an "interest expense".  Neither party, however, has asserted that this payment was either additional compensation for the founders' services or a distribution of profits.  See also supra notes 5 and 6.

Finally, in its petition the firm asserted that in 2003 it paid $500 to a company named Sure Prep for consulting services. As we explain below, we find that the firm did not make this payment.  See infra part I.D.

## Deductions

The firm filed Forms 1120 for 2001, 2002, and 2003, reporting gross receipts of $5,496,028, $5,742,420, and $6,338,482, respectively.  It reported taxable income of $11,249 for 2001 and zero in 2003.  It reported a loss of $53,271 for 2002.

Among the deductions claimed on the returns, the firm claimed "consulting fees" of $911,570 for 2001, $866,143 for 2002, and $994,028 for 2003.  Of the $994,028 of "consulting fees" deducted in 2003, $500 was for the alleged payment to Sure Prep.  The firm claimed on its 2003 return (i) a credit for prior-year minimum tax of $9,141, (ii) a net operating loss carryforward deduction of $49,579, and (iii) a deduction for the $34,421 that it paid PEM as an interest expense.

## Notice of Deficiency

In a notice dated December 5, 2007, the IRS determined the following deficiencies in tax:  $317,729 for 2001, $284,505 for 2002, and $377,247 for 2003.  The deficiencies primarily resulted from disallowance of the deductions for "consulting fees".  The IRS also determined that the firm was not entitled to the $34,421

interest expense deduction in 2003. And, as a result of its disallowance of the "consulting fee" deductions for 2001 and 2003, the IRS determined that for 2003 the firm was entitled to neither the credit for prior-year minimum tax nor the deduction for the net operating loss carry forward.

The IRS also determined that the firm was liable for accuracy-related penalties under section 6662 in the following amounts: $63,546 in 2001, $56,901 in 2002, and $73,238 in 2003.

OPINION

At issue is whether the IRS properly disallowed deductions for (i) "consulting fees" paid to the related entities, (ii) an interest expense paid to PEM, and (iii) "consulting fees" paid to Sure Prep. Also at issue is whether the IRS properly imposed penalties under section 6662. As we explain below, we find that the IRS properly disallowed the deductions and properly imposed penalties.

## I. Deductions and Credits

### A. Burden of Proof

Generally, the taxpayer has the burden of proving that the determinations in the notice of deficiency are wrong. Rule 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Section 7491(a)(1) shifts the burden of proof to the IRS if (i) the taxpayer satisfies the conditions set forth in section 7491(a)(2) and (ii) the taxpayer introduces credible evidence on factual

issues relevant to the taxpayer's liability for a tax under subtitle A or B. To satisfy section 7491(a)(2), the taxpayer must comply with the substantiation and recordkeeping requirements of the Internal Revenue Code. Sec. 7491(a)(2)(A). The taxpayer must also cooperate with reasonable requests by the IRS for "witnesses, information, documents, meetings, and interviews". Sec. 7491(a)(2)(B). And, if the taxpayer is a corporation, it must meet the net-worth requirements of section 7430(c)(4)(A)(ii). See sec. 7491(a)(2)(C). A taxpayer bears the burden of proving it satisfied these conditions. See Higbee v. Commissioner, 116 T.C. 438, 440-441 (2001). The firm has neither contended nor adduced evidence that it satisfied these conditions; thus section 7491(a)(1) does not shift the burden of proof to the IRS.

The firm therefore has the burden of proof regarding its entitlement to the deductions at issue.

B.  Payments to the Related Entities--"Consulting Fee" Deductions[10]

Section 162(a)(1) allows taxpayers to deduct "ordinary and necessary expenses", including a "reasonable allowance for salaries or other compensation for personal services actually rendered".  The IRS argues that the firm is not entitled to deductions for the "consulting fee" payments because the related entities rendered no services to the firm.  Citing Commissioner v. Natl. Alfalfa Dehydrating & Milling Co., 417 U.S. 134, 149 (1974), the IRS argues that the firm is bound to the form it chose for the transactions with the related entities.[11]

---

[10]As we explain below, we find that the firm is not entitled to deductions for the "consulting fee" payments to the related entities.  There is an additional reason the "consulting fees" paid to PEM in particular are not deductible.  The firm's counsel conceded--and Salvador testified--that some of the payments to PEM that were reported as "consulting fees" were properly characterized as "return[s] on capital".  The firm offered neither evidence nor a legal theory as to why such a return of capital is deductible.  Even if some part of the "consulting fee" payments to PEM were deductible, the firm has not demonstrated what part of the "consulting fee" payments were nondeductible returns of capital.  We have no way of reasonably allocating the "consulting fee" payments between returns of capital and nonreturns of capital.  Thus the "consulting fee" payments to PEM are not deductible because the firm has conceded that at least part of the payments was a return of capital.

[11]The firm structured the form of its transactions with the related entities as if it was paying the related entities for services rendered by the related entities.  The payments were made to the related entities, not the founders.  The firm recorded the payments in its general ledger as "consulting fees" paid to the related entities.  The checks issued by the firm did not designate the payments as payments for the founders' services.  And the way the firm filed tax forms and paid taxes

(continued...)

Therefore, the IRS argues, the "consulting fee" payments should be tested for deductibility as payments for the related entities' services--as opposed to payments for the founders' services. We need not reach this issue because, even if the payments are tested for deductibility as payments for the founders' services, the firm failed to show that the payments are deductible.

Section 1.162-7(a), Income Tax Regs., provides that "There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services <u>actually rendered</u>." (Emphasis added.) The firm concedes that no services were rendered by the related entities. Therefore the firm is not entitled to deduct the "consulting fee" payments as payments for services rendered by the related entities.

---

[11](...continued)
was consistent with payments made for the services of the related entities. The firm did not withhold payroll taxes on the "consulting fee" payments, as it would have been required to do with respect to employee compensation payments to the founders. It did not include the "consulting fee" payments on the founders' Forms W-2, Wage and Tax Statement, as it would have been required to do with respect to employee-compensation payments to the founders. It did not issue the founders Forms 1099-MISC, Miscellaneous Income, as it would have been required to do with respect to payments of nonemployee compensation to the founders. Finally, it did not report the "consulting fee" payments on its income tax returns as officers' compensation.

Evaluating the payments as if they were payments for the founders' services, we find that the firm has failed to show that it is entitled to the deductions.

### 1. Reasonableness

A deduction for compensation "may not exceed what is reasonable under all the circumstances."  Sec. 1.162-7(b)(3), Income Tax Regs.  The Court of Appeals for the Seventh Circuit, in Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 839 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, has held that to determine if payments of compensation are reasonable, an "independent investor test" should be applied. See also Menard, Inc. v. Commissioner, 560 F.3d 620, 623 (7th Cir. 2009), revg. T.C. Memo. 2004-207.  Appeal of this case will be to the Seventh Circuit, unless the parties otherwise agree. See sec. 7482(b)(1) and (2).  We follow the law of the Court of Appeals to which an appeal will lie.  Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971). Therefore, the independent investor test must be applied in determining whether the "consulting fee" payments are deductible.

The independent investor test creates a rebuttable presumption that an owner-employee's salary is reasonable if investors obtain a "far higher return than they had any reason to expect".  Exacto Spring Corp. v. Commissioner, supra at 839.  The test's rationale is that investors pay managers salaries to

"[work] to increase the value of the assets * * * entrusted to [their] management". Id. at 838. A high rate of return indicates that the assets' value increased and that the manager therefore provided valuable services. Id. Thus, if investors obtain returns above what they should reasonably expect, a manager's salary is presumptively reasonable. Id. at 839. The presumption is rebutted if the high rate of return is attributable to an extraneous event rather than the manager's efforts. See Menard, Inc. v. Commissioner, supra at 623 (giving examples).

The parties disagree on how to calculate the rate of return on investment, which is also known as the rate of return on equity. The firm contends that the rate of return on equity is equal to its gross revenue for one year minus its gross revenue for the prior year, divided by the gross revenue for the prior year. This definition is based on the theory that the value of the firm's equity is equal to the firm's gross revenue for one year. The firm claims that annual gross revenue is an appropriate measure of the firm's equity because someone once offered to buy the firm for a purchase price equal to one year's gross revenue. Gross revenues were $5,496,028 for 2001, $5,742,420 for 2002, and $6,338,482 for 2003, and the firm claims

that gross revenues for 2000 were $5,405,102.[12]  So the firm calculates that from 2000 to 2003 the cumulative rate of return for the shareholders was 17.27 percent.

The IRS does not propose an exact formula for rate of return on equity.  It argues only that rate of return on equity should depend on annual net income.  Any formula for rate of return on equity using annual net income would--in this case--result in a rate of return on equity near zero.  For example, if the rate of return on equity is defined as annual net income divided by the value of equity, the rate of return on equity would be near zero because (i) the firm's annual net income was near zero and (ii) the value of equity was substantial relative to that annual net income.

We agree with the IRS that the rate of return on the firm's equity should be calculated by reference to annual net income, not the year-to-year change in gross revenue.  It is inappropriate to look to gross revenue (or to changes in gross revenue) to determine if equity investors are receiving good returns on their investment.  A corporation's shareholders do not seek to maximize gross revenue.  They seek to maximize profit.

---

[12]The firm attached documents supporting this contention to its reply brief, but did not offer them into evidence. Statements in a party's brief and documents attached to a party's brief are not evidence.  Rule 143(c).  And we will not consider them.  See Godwin v. Commissioner, T.C. Memo. 2003-289, affd. 132 Fed. Appx. 785 (11th Cir. 2005).

See <u>Boyer v. Crown Stock Distribution, Inc.</u>, 587 F.3d 787, 793 (7th Cir. 2009).  Profit equals revenues minus cost.[13]  It is therefore different from revenues.  See <u>Wash. Natl. Ins. Co. v. Administrators</u>, 2 F.3d 192, 194 (7th Cir. 1993) ("Hoefer's desire to maximize <u>gross revenues</u>, contrasted with WNIC's desire to maximize <u>net profits</u>, put them on a collision course * * * ." (emphasis added)).  A company with high revenues does not necessarily have high profits.  Suppose, for example, that a company receives $1 million per year from its clients, pays $1 million to its employees in wages, and has no other revenues or costs.  The gross revenues of such a company would be $1 million, but its profit would be zero.  Such a company would not be earning a good rate of return for its equity investors.

Using annual net income comports with the approach taken by the Seventh Circuit in <u>Exacto Spring Corp. v. Commissioner</u>, <u>supra</u>.  In evaluating the rate of return on Exacto's equity, the Seventh Circuit relied on the Tax Court's finding that the rate of return on the equity of the Exacto Spring Corp. was 20 percent.  <u>Id.</u> at 838-839.  That 20 percent figure was based on the posttax profit of the company.  See <u>Heitz v. Commissioner</u>, <u>supra</u> ("An investor return analysis compares a company's <u>after-tax profit</u> to its equity to determine whether an independent

---

[13]Profit is roughly equivalent to annual net income for these purposes.

investor would be satisfied with the level of return." (emphasis added)).  Thus the Seventh Circuit in Exacto Spring looked to profit, not gross income.  Again, the Seventh Circuit is where an appeal of this case will lie, and we are required to follow its caselaw.

Having addressed the question of how to define the rate of return on equity, we find that the rate of return on the firm's equity is too low to create a presumption that the amounts claimed as "consulting fees" were reasonable compensation for the founders' services.  In Menard, Inc. v. Commissioner, 560 F.3d at 624, the rate of return on equity was 18.8 percent, and in Exacto Spring Corp. v. Commissioner, 196 F.3d at 838-839, the rate of return was 20 percent.  Both rates of return were high enough to create a presumption that the compensation received by the respective shareholders for their services was reasonable.  But in this case, the firm reported taxable income of $11,249 for 2001, a tax loss of $53,271 for 2002, and taxable income of zero for 2003.  This makes the rate of return on equity either near zero, below zero, or zero, in each respective year.  Thus the independent investor test does not create a presumption that the amounts were reasonable.

Without the aid of the presumption of reasonability, the firm has not otherwise shown that the amounts it seeks to deduct as compensation were reasonable.  Generally, "reasonable and true

compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Sec. 1.162-7(b)(3), Income Tax Regs.[14]  The firm has not satisfied this standard because, as we explain below:  (i) the firm's expert relied on irrelevant statistics regarding the amounts paid to the shareholder-employees at other companies and (ii) the firm has not shown that the other benchmarks it offered--the amounts it paid the minority shareholders and other employees--are appropriate for comparison.

Using statistics gathered from other firms, the firm's expert witness, Marc Rosenberg, opined on the reasonableness of amounts paid to each founder, which included (i) amounts designated as compensation and (ii) amounts designated as "consulting fees".  The first problem with his analysis is that the statistics he gathered from other firms were irrelevant.  He appears to have relied on the following statistic he gathered from each firm:  (i) the sum of (a) the salaries the other firm ostensibly paid its owners for its owners' services and (b) the

_____

[14]In considering evidence of what would be paid for services similar to the services provided by the founders, we bear in mind the Seventh Circuit's admonition in Exacto Spring Corp. v. Commissioner, 196 F.3d 833, 835 (7th Cir. 1999), revg. Heitz v. Commissioner, T.C. Memo. 1998-220, that courts should not invite themselves to "decide what the taxpayer's employees should be paid on the basis of the judges' own ideas of what jobs are comparable".  We consider evidence of what would be paid for similar services because we have first addressed the question of whether the taxpayer in this case had a high rate of return on equity.

other firm's net income, divided by (ii) the other firm's total number of owners.  This statistic does not necessarily correspond to what owners of other firms received for their services.  For example, suppose that another company paid its sole owner $300,000 per year in "salary" payments that were ostensibly for services.  This does not mean that the owner's services to the company were worth $300,000.  Even though the $300,000 in payments were nominally labeled by the company as "salary", the payments could in reality be a return on the owner's investment in the company (or a repayment of the investment).  Similarly, suppose that a company with a sole owner has $200,000 in net income.  This does not mean that its sole owner's services were worth $200,000.  The $200,000 in income could have resulted from the owner's investment in the company as opposed to the owner's services.  The second problem with Rosenberg's analysis is that he opined on the wrong thing.  He concluded that the payments to the founders were reasonable, not that they were reasonable <u>compensation for services</u>.  For example, the total payments to Mulcahy in 2001 were $393,129, which is the sum of $106,175 in wages and $286,954 in "consulting fees" paid through the related entities.  It does not help us to know, as Rosenberg informs us, that it was reasonable for the firm to pay Mulcahy $393,129.  What we need to know is whether $393,129 was a reasonable amount

to compensate Mulcahy for his services.  Rosenberg's report does not support the firm's position.

The firm also argues that, because the amounts it reported as compensation for each minority shareholder were more than the amounts it reported as compensation for each founder, the "consulting fees" it paid to the founders through the related entities must have been reasonable.  This argument fails for two reasons.  First, the firm did not establish that the amounts it paid the minority shareholders as compensation were actually compensation for services.  The minority shareholders were shareholders, not merely employees.  The payments they received could have been partially composed of profit distributions.  Second, the firm has not established that the services performed by the minority shareholders were like the services performed by the founders.

Similarly, the firm argues that the founders' pay is reasonable because the founders should be paid substantially more than nonshareholder employees whose salaries were similar to the amounts the firm paid the founders directly.  Although the compensation of nonshareholder employees would not include profit distributions, as could the payments to the minority shareholders, the firm has not shown how the services performed by these nonshareholder employees compare to the services performed by the founders.  The firm has offered only general

testimony about the importance of the founders to the firm and has not offered specific evidence about the services performed by the founders or any of the employees. The firm--which has the burden of proof--simply has not offered enough evidence to allow us to compare the relative value of the founders' services and the services of the nonshareholder employees.

Because the firm did not meet its burden of proof, we find that the "consulting fee" payments were not reasonable compensation to the founders.

### 2. Intent To Compensate

Besides being reasonable, to be deductible as compensation, a payment must be intended by the payor--at the time of payment--to compensate for services. See Paula Constr. Co. v. Commissioner, 58 T.C. 1055, 1058-1060 (1972), affd. without published opinion 474 F.2d 1345 (5th Cir. 1973); see also Exacto Spring Corp. v. Commissioner, 196 F.3d at 839 (stating that even where the taxpayer was entitled to the presumption of reasonability, "The government could * * * have prevailed by showing that while * * * [the owner employee's] salary may have been no greater than would be reasonable in the circumstances, the company did not in fact intend to pay * * * [the] amount as salary * * * ."). Where shareholders set their own pay, we must apply careful scrutiny because payments labeled as compensation may be profit distributions. Home Interiors & Gifts, Inc. v.

Commissioner, 73 T.C. 1142, 1156 (1980); cf. Menard, Inc. v. Commissioner, 560 F.3d at 622 ("treating a dividend as salary [is] less likely to be attempted in a publicly held corporation").

One characteristic of the "consulting fee" payments was that the amounts eventually paid to the founders were proportionate to the hours worked by the founders, rather than to the founders' ownership shares. Because of this, the firm argues that section 1.162-7(b)(1), Income Tax Regs., compels the conclusion that the firm did not intend for the payments to be profit distributions. That regulation provides that payments to shareholder-employees are likely to be profit distributions if: (i) the payments are proportionate to ownership shares and (ii) the payments are more than what employers normally pay for similar services. The regulation does not say that only payments that meet these two conditions can be considered profit distributions. Payments that fail the two conditions could qualify as profit distributions. For example, payments that are not proportionate to ownership shares can be profit distributions. See, e.g., Baird v. Commissioner, 25 T.C. 387, 395-396 (1955). Thus the "consulting fee" payments to the firm's founders can be considered profit distributions even though the payments are not proportionate to ownership shares.

We find that the firm intended for the payments to the related entities to distribute profits, not to compensate for services. As discussed above, Salvador chose the amount to pay each year so that the payments distributed all (or nearly all) accumulated profit for the year. He did this for tax planning purposes. Each founder's percentage of the payments to the related entities was tied to hours worked, but the firm's intent in making the payments was to eliminate all taxable income. The firm did not intend to compensate for services.

C.    Payments to PEM--Interest Expense Deduction

The firm claims it paid PEM $34,421, an amount that it deducted as an interest expense for 2003. The firm now concedes that the $34,421 was not deductible as an interest expense. But the firm asserts that it was deductible as compensation to the founders, paid through PEM. As discussed above, for a payment to be deductible as compensation for services under section 162(a)(1), the payor must intend to compensate for services. See supra part I.B.2. As with the payments designated as "consulting fee" payments, the firm has failed to show that this amount was intended as compensation, as opposed to a distribution of profits or payment of nondeductible interest. The firm has the burden of proof, and we therefore find that it was not entitled to the deduction.

D.   Payment to Sure Prep--"Consulting Fee" Deduction

A portion of the $994,028 deducted by the firm in 2003 in "consulting fees" was for an alleged $500 payment to Sure Prep. In its petition the firm asserted that in 2003 it paid $500 to Sure Prep for consulting services.  The IRS denied that the firm made the payment.  The parties' briefs did not address the deductibility of the purported payment.  Although there is an entry in the firm's general ledger that may correspond to this amount, see Ex. 46-R at 43, the firm provided no other evidence that it in fact paid the $500 or that the ledger entry corresponds to this purported payment.  Even if the firm paid the $500, no evidence shows that such a payment would have been deductible.  We therefore find that the $500 the firm claimed on the return was not paid, and alternatively, even if paid, that it is not deductible.

E.   The Net Operating Loss Deduction and the Credit for Prior-Year Minimum Tax

For tax year 2003, the IRS disallowed the firm's net operating loss deduction and the firm's credit for prior-year minimum tax.  Because the IRS properly disallowed the "consulting fee" and interest expense deductions, the IRS properly disallowed the net operating loss deduction and the credit for prior-year minimum tax.

II.  Penalties

The IRS determined that the firm was liable for accuracy-related penalties under section 6662.  Section 6662 imposes a 20% penalty on an underpayment of tax that results either from negligence or disregard of rules and regulations or from a substantial understatement of income tax.  The IRS determined that there were underpayments of tax for the years at issue and that the underpayments were attributable to substantial understatements of income tax or, alternatively, negligence.  As we explain below, we find that the firm is liable for the accuracy-related penalty due to substantial understatements of income tax.  We therefore do not reach whether the underpayments are also attributable to negligence.

Generally, an understatement is the excess of tax required to be shown on the return over the tax shown on the return.  Sec. 6662(d)(2)(A); sec. 1.6662-4(b)(2), Income Tax Regs.  For corporations other than S corporations and personal holding companies, an understatement is considered substantial if it exceeds $10,000 and exceeds 10 percent of the tax required to be shown on the return.  Sec. 6662(d)(1); sec. 1.6662-4(b)(1), Income Tax Regs.

No penalty is imposed on a portion of the underpayment if the taxpayer both (i) had reasonable cause for that portion and

(ii) acted in good faith regarding that portion.  See sec. 6664(c); sec. 1.6664-4(a), Income Tax Regs.

A.    Burden of Proof

Section 7491(c) provides that the IRS has the burden of production regarding the liability "of any individual for any penalty, addition to tax, or additional amount imposed by * * * [the Internal Revenue Code]."  To meet this burden, the IRS must "come forward with sufficient evidence indicating that it is appropriate to impose the relevant penalty."  Higbee v. Commissioner, 116 T.C. at 446.  The taxpayer, not the IRS, bears the burden of proof.  Thus, if the IRS meets the burden of production, the taxpayer bears the burden of proving that it is not liable for penalties.  Id. at 446-447.  The taxpayer bears the burdens of both production and proof on reasonable cause and good faith.  See id. at 446 ("the * * * [IRS] need not introduce evidence regarding reasonable cause").

B.    Substantial Understatement

The IRS met its burden of production for substantial understatement because it has shown that in each year in issue (i) the firm understated its tax and (ii) the understatement was substantial.  As discussed above, the IRS has shown that the firm understated its tax by $317,729 in 2001, $284,505 in 2002, and $377,247 in 2003.  The firm's returns show tax of $1,687 in 2001, zero in 2002, and zero in 2003.  Because each year's

understatement exceeds $10,000 and exceeds 10 percent of the total tax required to be shown on the return, the understatements were substantial. Thus the IRS has come forward with sufficient evidence that it is appropriate to impose the substantial understatement penalty for each year.

The firm failed to prove that it is not liable for the penalty. And, as explained below, the firm has not shown that it had reasonable cause for and acted in good faith regarding any part of any underpayment.

C.    Reasonable Cause and Good Faith

The firm argues that penalties should be abated because it had reasonable cause for and acted in good faith regarding the underpayments.

The firm has not met its burden of proof for reasonable cause and good faith. As to the "consulting fee" deductions paid to the related entities, the firm did not show that it had reasonable cause to believe it could deduct, as compensation, payments to entities that performed no services. The firm asserted that it "evaluated the applicable tax laws, reviewed relevant statistical information of like enterprises and determined that the compensation for the Founders paid as 'consulting fees' through the Affiliated Entities was deductible". Petrs. Posttrial Br. at 52. But the firm did not point to specific evidence that it had reasonable cause for the

underpayments. And the statistics on which Salvador relied were the same irrelevant statistics on which Rosenberg based his expert testimony. Besides, Salvador testified that when actually determining how much to pay through the related entities (at the end of each year) he looked to cash on hand, not to Rosenberg's statistics. Finally, the firm offered no reasonable cause for the underpayments attributable to the interest expense deductions and the deductions for "consulting fees" paid to Sure Prep.

Generally, one of the most important factors in demonstrating reasonable cause and good faith is the extent of the taxpayer's effort to determine its proper tax liability. Sec. 1.6664-4(b)(1), Income Tax Regs. The firm provided little evidence of such efforts. Other factors include the taxpayer's experience, knowledge, and education. Id. These factors weigh heavily against the firm, which specialized in accounting and consulting. Thus the firm has not proven that it had reasonable cause for and acted in good faith regarding any part of any underpayment.

We therefore find that the IRS correctly determined that the firm is liable for the penalty under section 6662 for substantial understatement of income tax.

III. Summary

The firm has not shown that it was entitled to the "consulting fee" deductions for payments to the related entities.

The firm has not shown that it is entitled to deduct the $34,421 for which it claimed a deduction as an interest expense.  And the firm has not shown that it was entitled to deduct the $500 it claims to have paid to Sure Prep as "consulting fees".

We therefore sustain the IRS' determinations disallowing (i) the "consulting fee" deductions for 2001, 2002, and 2003; (ii) the interest expense deduction for 2003; (iii) the net operating loss deduction for 2003; and (iv) the credit for prior-year minimum tax for 2003.

Finally, the IRS has shown that it was appropriate to impose penalties under section 6662 for substantial understatement of income tax.  The firm has failed to show that it had reasonable cause for and acted in good faith regarding any part of any underpayment.  We therefore sustain the IRS' determinations on penalties.

To reflect the foregoing,

Decision will be entered

for respondent.